IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

TORI ALGEE,                                                Civ. No. 6:19-cv-00848-AA

                    Plaintiff,                          **OPINION & ORDER**

      v.

OREGON DEPARTMENT OF
HUMAN SERVICES,

                  Defendant.

_____

AIKEN, District Judge.

       This matter comes before the Court on Defendant's Motion for Partial Summary Judgment, ECF No. 33. The Court concludes that this matter is appropriate for resolution without oral argument. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

**LEGAL STANDARDS**

       Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a

reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## BACKGROUND

Plaintiff Tori Algee is an African American woman and was an employee of Defendant Oregon Department of Human Services ("DHS") beginning in 2001. First Am. Compl. ("FAC") ¶¶ 6-9. ECF No. 8. Plaintiff has an associate degree in human services and a bachelor's degree in social work from the University of Missouri. Johnson Decl. Ex. A, at 11-12.[1] ECF No. 38. Plaintiff was certified as a Lean Six

---

[1] Plaintiff's counsel had submitted the exhibits in support of Plaintiff's Response as single, undifferentiated file. Although the file is divided into exhibit, these exhibits lack consistent internal pagination. For the sake of clarity, the Court will cite to the page number of the entire file, rather than to the inconsistent page numbers of each exhibit, so that "Johnson Decl. Ex. A, at 12" refers to the twelfth page of the entire file, rather than the twelfth page of Exhibit A to the Johnson Declaration.

Sigma Black Belt in 2011.   FAC ¶ 19.   In 2016, Plaintiff was certified in Project Management by Willamette University.   FAC ¶ 24.   Plaintiff was also the chair of DHS's African American Management Council, an Employee Resource Group specifically comprised of African American managers.   *Id.* at ¶ 25.

Plaintiff's first position with DHS was as a Social Service Specialist 1, beginning on March 16, 2001.   FAC ¶ 9.   This position was "non-management" and "non-supervisory."   *Id.*

On November 8, 2008, Plaintiff was promoted to the position of Operations and Policy Analyst 3 ("OPA3"), which was a "non-supervisory management" position. FAC ¶ 17.   This position was originally a job rotation but became permanent on December 1, 2009.   *Id.* at ¶¶ 17-18.   As "non-supervisory management," Plaintiff had no authority to hire, fire, reward, or discipline other employees.   *Id.* at ¶ 22.

On November 13, 2013, Plaintiff was laterally transferred to the Oregon Health Authority ("OHA") as an OPA3 Lean Leader.   FAC ¶ 20.

On September 1, 2014, Plaintiff returned to DHS when she was promoted to a Project Manager 3 ("PM3") position in the Office of Continuing Improvement ("OCI") with DHS.   FAC ¶ 21; Johnson Decl. Ex. A, at 17.   This was another "non-supervisory management" position.   FAC ¶ 21.   Plaintiff had to apply and competitively interview for the PM3 position with OCI.   Johnson Decl. Ex. A, at 19.

On October 17, 2017, Plaintiff emailed then-Director of OCI Wes Rios to express her frustration at being passed over for an important project, despite her certifications and seniority within the organization.   FAC ¶ 30; Johnson Decl. Ex. B,

at 144-46.  Wes Rios subsequently left DHS and was replaced by his deputy, Glen Bason, who was aware of Plaintiff's October 2017 email to Rios.  Johnson Decl. Ex. A, at 28.

On April 6, 2018, Plaintiff joined a group of African American women employed by DHS in approaching the Governor's office to discuss observations of hiring bias at DHS, including a lack of diversity in interview panels; the appearance of "managers hiring who they want" rather than based on qualifications; the perception of advancement based on ethnicity; and the perception that "African American female staff are perceived as problematic, aggressive, angry, [etc.]"  FAC ¶¶ 40-41.

Setha Nhoung is an Asian American man who was hired by DHS on December 7, 2009.  FAC ¶¶ 27-28.  On March 31, 2014, Nhoung was promoted to an OPA3 position within OCI.  *Id.* at ¶ 29.  On May 1, 2018, Nhoung was rotated to a PM3 position within OCI. *Id.* at ¶ 43.  Nhoung attended college but does not have a bachelor's degree.  Johnson Decl. Ex. D, at 184.

In July 2017, Timothy Sinatra was appointed as the Director of Organizational Change within the Office of the Director of DHS.  Johnson Decl.  Ex. I, at 359-60.

In July 2018, Bason left his position as Director of OCI.  Johnson Decl. Ex. A, at 31. On July 23, 2018, DHS made Nhoung the Interim Principal Executive Manager ("PEM") E/OCI Director ("Interim Director,"), replacing Bason.  FAC ¶ 44.  This was a "supervisory management service position," but subordinate to the vacant PEM-F position of OCI Director.  FAC ¶ 45; Johnson Decl. Ex. C, at 158.

At the time, Plaintiff was substantially senior to Nhoung.  Johnson Decl. Ex. A, at 32.  Nhoung testified that there was no recruitment for the Interim Director position and that his reaction to being offered the position was one of "utter shock." Johnson Decl. Ex. D, at 190.  Nhoung did not think he "would be a good manager at that time" and expressed his reservations to Bason.  *Id.* at 191.  Nhoung described the appointment as a "promotion on paper" and stated that, although his classification changed, he did not receive an increase in pay.  *Id.* at 191-92.

The outgoing OCI Director, Bason, testified that Nhoung was selected as the Interim Director because "he had skills," but "no interest in management" and so would not be applying for the permanent director position.  Pierson Decl. Ex. 6, at 2-3.  ECF No. 34.  Bason testified that there were three or four OCI staffers, including Plaintiff, who wanted to be the OCI Director and it was felt that if any of them were appointed to be Interim Director, the appointment would "be a hand on the scale to some degree."  *Id.*  By appointing Nhoung, who had no interest in the permanent position, Bason felt they would "make sure everybody had a fair chance to apply for that job who had a real interest in management."  *Id.*  In the case of Plaintiff, Bason testified that Plaintiff had "overwhelming skills" and that, had she been selected to be Interim Director and eventually selected for the permanent director position, Bason anticipated complaints from the other applicants that "she had an unfair head start on them because she got to sit in an interim role."  Johnson Decl. Ex. C, at 160.

DHS commenced a search for a permanent replacement for the director position and recruitment ran from September 16, 2018 to September 27, 2018.  FAC

¶ 53.  Plaintiff met the minimum qualifications for the OCI Director position and applied for the job. *Id.* at ¶ 55.  Plaintiff was one of ten candidates interviewed for the position and was one of four candidates who reached the second-round interviews. *Id.* at ¶¶ 55-56.  As Interim Director, Nhoung participated in conducting the first round of interviews but understood that Sinatra, as the Director of Organizational Change, had the final say on the selection of a candidate.  Johnson Decl. Ex. D, at 200.

Plaintiff was rated as third of the four candidates considered at the second round.  FAC ¶ 57.  Comments critical of Plaintiff during the interview process focused on Plaintiff's lack of experience as manager, supervisor, and leader.  *Id.* at ¶ 59.  Sinatra testified that if Plaintiff had been appointed as Interim Director and had been successful in the position, it would have provided her with the leadership experience that Sinatra felt Plaintiff's resume lacked.  Johnson Decl. Ex. E, at 246.

The candidate selected to fill the position as OCI Director was Nasreen Khan. FAC ¶ 58.  The PEM-F position filled by Khan is senior to the PEM-E Interim Director position temporarily held by Nhoung.  Johnson Decl. Ex. C, at 162.  The PEM-E position was not filled.  *Id.*  Khan is a woman of color and was born in India.  FAC ¶ 58; Johnson Decl. Ex. A, at 60.  Notes from Khan's selection focused on her management experience.  FAC ¶ 60.

On July 26, 2019, Plaintiff resigned her position with DHS to take a limited duration position with OHA as a senior analyst.  FAC ¶ 62; Pierson Decl. Ex. 5, at 3.

Plaintiff makes the same salary at OHA as she earned at DHS.  Pierson Decl. Ex. 5, at 4.  Plaintiff's position with OHA was subsequently made permanent.  *Id.* at 5.

Plaintiff testified that she left DHS due to feeling hopeless, overlooked, and discriminated against.  Pierson Decl. Ex. 5, at 3.  Plaintiff described the environment as "toxic" and testified that she "felt like my career was not advancing within the organization because of their practices and it was becoming too stressful."  *Id.*  When asked what she viewed as "toxic" at DHS, Plaintiff testified that she saw people less qualified, with less education, and less seniority "handed positions and opportunities that just were never afforded to me in my 18 years of working with that organization."  Johnson Decl. Ex. A, at 64-65.  Plaintiff testified that the stress was beginning to affect her physical and mental health, as well as her home life.  Pierson Decl. Ex. 5, at 3.

Plaintiff filed an administrative complaint with the Oregon Bureau of Labor and Industries ("BOLI") and with the Equal Employment Opportunity Commission ("EEOC") alleging wrongful discrimination.  FAC ¶ 4.  This action followed.  *Id.*

## DISCUSSION

Plaintiff brings claims for (1) intentional employment discrimination on the basis of race and sex in violation of 42 U.S.C. § 2000e-2(a)(1) and (2) based on Defendant's decision to select Nhoung, rather than Plaintiff, as the Interim Director of OCI; (2) disparate impact employment discrimination based on race and sex in violation of 42 U.S.C. §2000e-2(k) alleging that Defendant's institutional decision-making process has a disparate impact on African American women by eliminating

them from consideration for positions with supervisory responsibility; (3) retaliation in violation of 42 U.S.C. §2000e-3(a) alleging that Defendant passed over Plaintiff for both the Interim Director position and the OCI Director position because of Plaintiff's past complaints concerning treatment of African Americans working for DHS; and (4) constructive discharge based on race and sex in violation of 42 U.S.C. § 2000e-2(a)(1). Defendant moves for summary judgment as to all four claims

## I.     Disparate Impact

To establish a disparate impact claim under Title VII, a plaintiff must first show that the defendant employs a practice, the consequences of which "fall more harshly on one group than another and cannot be justified by business necessity." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). "[T]o make a prima facie case of disparate impact under Title VII, the plaintiff[ ] must show that a facially neutral employment practice has a significantly discriminatory impact upon a group protected by Title VII." *Paige v. California*, 291 F.3d 1141, 1144 (9th Cir. 2002) (internal quotation marks and citation omitted). "This showing consists of two parts: the plaintiff must demonstrate 1) a specific employment practice that 2) causes a significant discriminatory impact." *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1224 (9th Cir. 2021) (internal quotation marks and citation omitted, alterations normalized). "The plaintiff must also establish that the challenged practice is either (a) not job related or (b) inconsistent with business necessity." *Id.* (internal quotation marks and citation omitted, alterations normalized). Even if the practice is job related and consistent with business necessity, a plaintiff may still prevail "by

showing that the employer refuses to adopt an available alternative practice that has less disparate impact and serves the employer's legitimate needs." *Id.* (internal quotation marks and citation omitted). Plaintiffs are not required to show that the employer had a discriminatory intent to establish a prima facie disparate impact claim. *Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002).

"Plaintiffs generally cannot attack an overall decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact." *Stout*, 276 F.3d at 1124. In this case, Plaintiff alleges that DHS's promotion process causes a disproportionate impact on African American women by failing to consider them for supervisory positions. FAC ¶ 81.

In a disparate impact case, the plaintiff "must actually prove the discriminatory impact at issue." *Stout*, 276 F.3d at 1122. "Statistical evidence is used to demonstrate how a particular employment practice causes a protected minority group to be under represented in a specific area of employment (for example, hiring or promotion)." *Paige*, 291 F.3d at 1145. In addition, the "statistical disparities must be sufficiently substantial that they raise an inference of causation." *Stout*, 276 F.3d at 1122. "Although the probative value of any statistical comparison is limited by the small available sample," the Ninth Circuit has not drawn a "bright line to determine the adequacy of a data set." *Freyd*, 990 F.3d at 1225 (internal quotation marks and citation omitted). "Summary judgment is appropriate when statistics do not support

a disparate impact analysis." *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir. 2003).

*Harris v. City of Fresno*, 625 F. Supp.2d 983 (E.D. Cal. 2009), is an illustrative example of this analysis. In *Harris*, the district court considered a disparate impact claim brought by an African American plaintiff who was passed over for a promotion. *Id.* at 996. The *Harris* court found that the plaintiff's own declaration was insufficient to create a triable issue where the plaintiff "has not identified *one* other African-American who, allegedly, has not been promoted on account of race, nor has Plaintiff pointed to any evidence which suggests that, for promotions, African-Americans are disproportionately affected when compared to other racial groups." *Id.* (emphasis in original).

In this case, Defendant retained an expert, Heather Smalley, Ph.D., to perform statistical analysis of Plaintiff's claims. Pierson Decl. Exs. 2, 3. Dr. Smalley found that the percentages of African Americans and women working at DHS were greater than their representation as a percentage among Oregon residents at large. Pierson Decl. Ex. 3, at 1-2. Hiring data also supported the conclusion that African American applicants were hired at a percentage exceeding the percentage of African American residents of Oregon generally, except in 2019. *Id.* at 2. Dr. Smalley found no evidence of the alleged differences in separation from employment for African American employees at DHS, noting that between 2017 and 2021, only two employees classed between PEM-D and PEM-J were separated from their employment and that those separations were the result of retirement, rather than termination. *Id.* Between

2017 and 2021, Dr. Smalley found that women accounted for between 58.8% and 61.51% of DHS employees, a "clear majority." *Id.* at 7.

In her response, Plaintiff focuses on DHS's practice of direct appointment, although this is not the specific policy challenged in the FAC, which refers to promotion.   In its response to Plaintiff's BOLI/EEOC complaint, Defendant represented that there were 49 direct appointments between January 2018 and January 2019.  Johnson Decl. Ex. I, at 359.  Of those appointments, 13 were people of color; 4 were African American; 26 were women; 6 were women of color; and one was an African American woman.  *Id.*  Defendant's BOLI/EEOC response shows that direct appointment accounted for only 1.9% of all DHS recruitment in 2018 and that, while only 3.4% of DHS's employees were African American, fully 8% of the direct appointments were African American and over half of the direct appointments (53%) were women.  *Id.*  On this record, Defendant's response to Plaintiff's BOLI/EEOC complaint does not demonstrate a disparate impact against African American women in the direct appointment process, let alone in the promotion process more generally.

On the contrary, Dr. Smalley's report showed that the "the percentages of African American and female employees at DHS were greater than that of their representation of Oregon residents at large, respectively."  Pierson Decl. Ex. 3, at 2. Nor did the data reflecting DHS's hiring or retention practices provide support for claims "regarding disproportionate hiring and separation practices when compared to the racial distribution of Oregon residents."  *Id.*

As Plaintiff has failed to show that DHS's facially neutral employment practices had a disproportionate impact on African American women, the Court concludes that Defendant is entitled to summary judgment on this claim.

## II.    Disparate Treatment

Federal law prohibits an employer from taking an adverse employment action against an employee because of his or her race.  42 U.S.C. § 2000e-2.  "For a prima facie case, [the plaintiff] must offer evidence that give[s] rise to an inference of unlawful discrimination, either through the framework set forth in *McDonnell Douglas Corp. v. Green* [411 U.S. 792 (1973)] or with direct or circumstantial evidence of discriminatory intent."  *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (internal quotation marks, citation, footnotes omitted).  In other words, "the plaintiff first must establish a prima facie case of discrimination by coming forward with evidence that an employer considered race in its employment decisions."  *Doe v. Kamehameha Schs./Bernice Pauahi Bishop Estate*, 470 F.3d 827, 837 (9th Cir. 2006).

To create a prima facie case under the *McDonnell Douglas* framework, the plaintiff "must show that: (1) he belonged to a protected class; (2) he was qualified for his job; (3) he was subjected to an adverse employment action; and (4) similarly situated employees not in his protected class received more favorable treatment."  *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818 (9th Cir. 2002).  If the plaintiff "establishes a prima facie case," a presumption of discrimination arises and "the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the employment decision."  *Leong v. Potter*, 347 F.3d

1117, 1124 (9th Cir. 2003). "If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a pretext for discrimination." *Id.* The plaintiff can show that the employer's articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002) (internal quotation marks and citation omitted).

Here, Defendant does not dispute that Plaintiff belongs to a protected class and was qualified for the position but contends that Plaintiff was not subjected to an adverse employment action.[2] However, the Ninth Circuit has held that it is "beyond dispute" that the denial of a single promotion opportunity is an adverse employment action for Title VII purposes. *Briener v. Nevada Dept. of Corr.*, 610 F.3d 1202, 1207-08 (9th Cir. 2010). The decision not to promote Plaintiff was therefore a qualifying adverse employment decision and the Court declines to grant summary judgment as to this claim.[3]

---

[2] Defendant makes a conclusory statement that the only identified comparators for Plaintiff were Nhoung, an Asian American man, and Khan, a woman of color and states that Plaintiff's claim fails as a matter of law. Defendant does not advance any argument as to why those individuals are inappropriate comparators, given that neither Nhoung nor Khan is a member of the same protected class as Plaintiff, nor does Defendant explain why Plaintiff's claim should fail other than that there was no adverse employment action. Def. Mot. 10.

[3] Defendant does not advance any challenge to Plaintiff's disparate treatment claim other than the absence of an adverse employment decision and so the Court reserves discussion of the stated reasons for the selection of Nhoung as the Interim Director to section of this Order devoted to Plaintiff's retaliation claim.

### III.    Constructive Discharge

To survive summary judgment on a claim for constructive discharge under Title VII, the plaintiff "must show a triable issue of fact as to whether a reasonable person in her position would have felt that she was forced to quit because of intolerable and discriminatory working conditions." *Bergene v. Salt River Project Agric. Imp. and Power Dist.*, 272 F.3d 1136, 1143-44 (9th Cir. 2001) (internal quotation marks and citation omitted, alterations normalized).    To establish constructive discharge, "a plaintiff must show at least some aggravating factors, such as a continuous pattern of discriminatory treatment." *Id.* (internal quotation marks and citation omitted).  More specifically, the Ninth Circuit has held that constructive discharge occurs:

> when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.

*Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000).

In this case, Plaintiff alleges that she was subjected to treatment so intolerable that she chose to accept a position with OHA rather than remain with DHS. However, when questioned about those conditions during her deposition, Plaintiff testified about her own dissatisfaction at being passed over for promotion and her perceptions of the people who were promoted.  The Court notes that Plaintiff's testimony on this point reflects Plaintiff's own feelings about her job and employer,

rather than the conditions of her employment or any action of her employer, aside from promoting people Plaintiff felt to be less qualified than herself.  Plaintiff did not describe deteriorating or intolerable working conditions of any kind, let alone conditions that would overcome the normal motivation of a reasonable employee to remain in her position.  The Court therefore concludes that Defendant is entitled to summary judgment on this claim.

## IV.    Retaliation

Plaintiff alleges that the decision not to appoint her as the Interim Director or to promote her to the full director position was taken in retaliation for her criticism of DHS in her email to Rios and for her participation in groups advocating for the advancement of African American employees within DHS.

Under Title VII, it is "an unlawful employment practice for an employer to discriminate against of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) that she engaged in a protected activity; (2) that her employer subjected her to an adverse employment action; and (3) that a "causal link exists between the protected activity and the adverse action."  *Manatt v. Bank of Am., NA*, 339 F.3d 792, 800 (9th Cir. 2003) (internal quotation marks and citation omitted).  If the plaintiff establishes these three elements, the burden shifts to the employer to articulate a legitimate reason for the adverse employment action.  *Id.*  If the employer

meets that burden, then the plaintiff has the burden of showing that the employer's stated reasons are merely a "pretext for a discriminatory motive." *Id.*

In this case, Defendant does not challenge Plaintiff's showing of a prima facie case and instead asserts that it had a legitimate reason for its decisions. In the case of appointing Nhoung as Interim Director, Bason testified that he was aware of multiple OCI staff members, including Plaintiff, who intended to apply for the director position and that if any one of them were made Interim Director, they would have had an unfair advantage in the application process. Nhoung was selected as Interim Director because he was not interested in being the permanent director and so there was no risk that his appointment would skew the selection process. And while Khan was selected as the permanent director, the Interim Director position held by Nhoung was not subsequently filled.

In response, Plaintiff points to Bason's deposition testimony concerning subsequent developments. Johnson Decl. Ex. C, at 162-63. Bason testified that Tammy Gover, a white woman, was subsequently appointed to fill the PEM-E position previously held by Nhoung, once again on an interim basis. *Id.* at 162. Bason was not aware of why Gover had been selected as Interim Director and testified that Gover was one of the individuals Bason believed would apply for the permanent PEM-F director position. Johnson *Id.* at 163. Bason emphasized that he was not part of the decision-making process when Gover was selected and he did not know the details or the reasons for her selection as Interim Director. *Id.* at 164-65. Of note, the

interim PEM-E position held by both Nhoung and Gover was never made a permanent position. *Id.* at 162.

Plaintiff contends that the selection of Gover as Interim Director after Nhoung, contradicts Defendant's stated reason for choosing Nhoung over Plaintiff for the Interim Director position because Gover, like Plaintiff, had an interest in the permanent director position. However, Bason testified that Khan, as permanent director, would have been the official responsible for choosing Gover for the interim position. Johnson Decl. Ex. 3, at 165. Because the permanent director position was already filled by Khan, there was no risk that Gover's appointment to the non-permanent interim position would skew an ongoing and otherwise competitive application process to fill the permanent director position. The selection of Gover as Interim Director *after* the permanent director position was filled does not reveal Defendant's stated reasons for selecting Nhoung for the same position *during* a competitive application process to be a pretext for discrimination or retaliation against Plaintiff. The Court therefore concludes that Defendant is entitled to summary judgment on this claim as to the decision not to appoint Plaintiff as Interim Director.[4]

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Partial Summary Judgment, ECF No. 33, is GRANTED in part and DENIED in part. Plaintiff's Title VII claims for disparate impact and constructive discharge are dismissed. Plaintiff's

---

[4] Defendant does not appear to move for summary judgment on this claim as it applies to the decision not to select Plaintiff for the permanent director position.

Title VII claim for retaliation is dismissed insofar as it challenges the decision not to appoint Plaintiff as the Interim Director of OCI.  Defendant's Motion is otherwise denied as stated above.  Defendant's Motion for Extension of Time, ECF No. 32, is GRANTED.

It is so ORDERED and DATED this ___8th___ day of July 2022.


_/s/Ann Aiken_____
ANN AIKEN
United States District Judge